UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
ALLAH-KASIEM,                      :
                                   :
                 Plaintiff,        :      09 Civ. 9665 (DLC)
                                   :
       -v-                         :      OPINION & ORDER
                                   :
WLADYSLAW SIDOROWICZ, Facility     :
Health Services Director, Sullivan :
Medical Department, Sullivan       :
Correctional Facility, RENE        :
LAWRENCE, Correction Sergeant,     :
BRYAN HILTON, Assistant Deputy     :
Superintendant, Department of      :
Correctional Services,             :
                                   :
                 Defendants.       :
                                   :
-----------------------------------X

APPEARANCES:

For Pro Se Plaintiff:

Allah-Kasiem
DIN Number 83A0783
Sullivan Correctional Facility
325 Riverside Drive
P.O. Box 116
Fallsburg, NY 12733

For Defendants:

Kevin R. Harkins
Assistant Attorney General
State of New York
120 Broadway, 24th Floor
New York, NY 10271


DENISE COTE, District Judge:

     Plaintiff Allah-Kasiem ("Kasiem"), an inmate at the

Sullivan Correctional Facility ("Sullivan") brought this pro se

action under 42 U.S.C. § 1983 against current and former Sullivan employees.  The surviving claims are brought against three individuals:  Sergeant Rene Lawrence ("Lawrence"), Deputy Superintendent Bryan Hilton ("Hilton"), and Dr. Wladyslaw Sidorowicz ("Sidorowicz").  Kasiem alleges that Lawrence retaliated against him in violation of his First Amendment rights, that Hilton violated his due process rights, and that Sidorowicz was deliberately indifferent to his medical needs. The parties have cross-moved for summary judgment.  The defendants' motion is granted and Kasiem's motion is denied.


BACKGROUND

     The following facts are undisputed, unless otherwise noted. The facts underlying the retaliation claims will be described first.  The facts underlying Sidorowicz's involvement in Kasiem's medical care will be described last.


I.  Lawrence:  Retaliation Claims

     Kasiem asserts that Lawrence wrote two Inmate Misbehavior Reports ("IMR") to retaliate against him (1) for statements Kasiem made to Lawrence on March 9, 2009, and (2) for Kasiem's successful appeal of the outcome of a disciplinary hearing.

A.  March 9, 2009 IMR

On March 9, 2009, Kasiem approached Lawrence, then a relatively new officer at Sullivan, as Lawrence conducted housing unit rounds.  Kasiem told Lawrence that he had "confidential information" for her.  Kasiem gave her a folded piece of paper; upon unfolding the paper, Lawrence found it contained a list of lawsuits Kasiem claimed to have won.  Kasiem then told Lawrence, using extremely graphic language, that other officers were discussing her in inappropriate sexual terms and placing bets on who would be the first to sleep with her. Kasiem also told Lawrence to "watch [her] back."

Lawrence reported the incident on the same day to her superior, Lieutenant James Maxwell ("Maxwell").  After speaking with Maxwell, Lawrence wrote an IMR against Kasiem (the "March 9 IMR"), and at Maxwell's direction placed Kasiem in keeplock confinement pending a disciplinary hearing on the IMR.[1]  The March 9 IMR charged Kasiem with lying, interference, and harassment of an employee.  Following a March 18 hearing, Kasiem was found guilty of the disciplinary charges in the March 9 IMR and given ninety days of keeplock confinement and a loss of several privileges for 120 days.  On April 13, Kasiem's March 18

---

[1] Keeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates. Peralta v. Vazquez, 467 F.3d 98, 103 n.6 (2d Cir. 2006).

disciplinary determination was reversed by an official at the State Department of Correctional Services ("DOCS").

B.  June 16, 2009 IMR

Kasiem asserts that Lawrence retaliated against him on a second occasion when she filed an IMR against him on June 16, 2009, for harassment and stalking, inter alia.  On that day, Lawrence received a letter from Kasiem, stating that he had "selected" her to be his employee assistant in an upcoming disciplinary hearing.  Kasiem's letter stated:  "Kindly be advised that I have selected you to be my employee assistant in connection with a Tier 2 hearing for an alleged violation of the greatest breach of security in the history of Sullivan -- a piece of candy."  Kasiem had been provided notice that inmates are only entitled to employee assistance at Tier III hearings.  Lawrence was also aware that inmates are not entitled to employee assistance in Tier II hearings.

Lawrence had another corrections officer escort Kasiem to a duty sergeant's office to discuss the letter, and ordered Kasiem to enter the office and sit down.  Kasiem refused to do so, and stated that he wished to speak with Lawrence privately.  Lawrence again ordered Kasiem to enter the office and sit, and Kasiem complied.  Upon questioning, Kasiem admitted that he had

4

written the letter to Lawrence.  Lawrence then wrote an IMR
against Kasiem (the "June 16 IMR"), charging him with stalking
an employee, harassing an employee, and refusing to obey a
direct order.

In her affidavit, Lawrence states that she "transferred out
of Sullivan after only five months there in large part to remove
myself from" Kasiem.  Lawrence is currently a sergeant at Ulster
Correctional Facility.


II.  Hilton:  Due Process Claim

On July 8, 2009, Hilton began presiding over a disciplinary
hearing initiated by a June 30 IMR.  Hilton was then Sullivan's
Assistant Deputy Superintendent for Programs and regularly
presided over inmate disciplinary hearings.  Kasiem's hearing
concluded on July 21.  The June 30 IMR was authored by
Corrections Officer Martin Albert ("Albert") and charged Kasiem
with (1) providing legal assistance to another inmate without
prior approval; (2) altering a document; (3) providing
misleading and/or false statements; and (4) being in possession
of contraband.

The record at the hearing reflects the following events:
On June 30, Albert conducted a search of Kasiem's cell.  The
search turned up an envelope of legal work belonging to inmate

5

Garnett Johnson ("Johnson"), as well as a pair of scissors. Albert confiscated these items.

Kasiem contends that in the course of the search, Albert found a copy of a Legal Assistance Form that purportedly authorized Kasiem to perform legal work on Johnson's behalf. Albert asserted that Kasiem provided him with the form after Albert asked whether Kasiem was authorized to perform legal work for Johnson.  The Legal Assistance Form was signed by Deputy Superintendent for Programs Patty Nelson ("Nelson") and dated December 11, 2008.  The form also included an expiration date, "1/", with the remainder of the date missing.  Following the search, Albert described the form over the telephone to Nelson, who responded that Legal Assistance Forms expire after 30 days and always contain an expiration date.

Albert also called Sullivan's law library and spoke with either Officer Brian Villegas ("Villegas") or Officer Gordon Simpson.  One of these two law library officers located a copy of the December 11 form, which was identical to Kasiem's copy except that the law library's copy had a complete expiration date of "1/11/09".

On July 14, Albert testified by telephone at Kasiem's disciplinary hearing, and Kasiem cross-examined him.  Kasiem called Nelson as a witness, who testified by telephone that she

always puts a 30-day expiration date on Legal Assistance Forms, and that she could not have made a mistake in forgetting to put an expiration date on a form because she is "very meticulous". Nelson also stated that she no longer had a record of the December 11 Legal Assistance Form because she only keeps records of currently valid forms.

Kasiem next called Johnson to testify.  Johnson stated that he had received a copy of the December 11 Legal Assistance Form from Nelson on December 11, 2008, and that his copy was identical to the one Kasiem presented at the hearing, with an incomplete expiration date.  Johnson also stated that he had provided legal documents to Kasiem on June 29 after Kasiem inquired about an Article 78 petition that Johnson had filed. After Johnson testified, Kasiem declined the opportunity to question Nelson again.

Kasiem then called Roger Traynor ("Traynor"), the corrections officer serving as Kasiem's employee assistant for the hearing.  Kasiem presented two Legal Assistance Forms to which Kasiem had been referring throughout the hearing, which Traynor had procured at Kasiem's request.  One of these copies had a complete expiration date, and Kasiem claimed that the date on this document had been forged.  The other copy, which Kasiem maintained was an original copy of the form signed by Nelson,

7

had the incomplete expiration date.  Traynor testified that he
had secured the copy with a complete expiration date from the
law library, and the copy with the incomplete date from the
evidence locker.

After Traynor testified, Kasiem told Hilton he had no more
witnesses to call.  Hilton provided Kasiem with an opportunity
to present closing testimony, and Kasiem described at length the
theory of his defense.  Kasiem first claimed that he had not
been performing legal assistance for Johnson at all, but instead
had borrowed legal materials from Johnson.  Kasiem asserted that
Nelson had forgotten to put a complete expiration date on the
December 11 Legal Assistance Form, and alleged that Albert and
Villegas retaliated against Kasiem for previous grievances by
forging the remainder of the expiration date on the law
library's copy to make it look like Kasiem had altered his form.
Kasiem also argued that when he had been transferred to Sullivan
from another facility seven years before, a sewing kit with
scissors was improperly logged.  As a result, his file
erroneously failed to reflect that he was permitted to possess
the scissors.

Hilton found Kasiem guilty of providing unauthorized legal
assistance, counterfeiting or forgery, and making false
statements.  He found Kasiem not guilty of possessing

contraband.  Hilton ordered Kasiem placed in keeplock for 120 days, with a loss of several privileges.  Hilton allowed Kasiem to place his objections on the record, and informed Kasiem of his appeal rights.  In a written statement of the hearing's disposition, dated July 22, Hilton stated that the disposition was based upon the IMR and Sullivan "staff and inmate witness testimony".

III.  Sidorowicz:  Medical Claims

Kasiem's February 1, 2011 amended complaint contains two sets of constitutional allegations against Sidorowicz, a medical doctor and Sullivan's Facility Medical Director.  The first set of allegations pertains to Kasiem's claim that he is legally blind and requires accommodations.  Kasiem's second set of allegations arises out of Sidorowicz's decision to prescribe the drug Neurontin to help treat Kasiem's neuropathic pain in 2010.

A.  Visual Impairment

The defendants have submitted extensive medical records, from the period August 2008 through March 2010, of the treatment of Kasiem's vision by Sullivan's medical staff.  These records include the reports of consultants outside the correctional system to whom Kasiem was referred with Sidorowicz's approval.

At a routine eye examination at Sullivan on August 20, 2008, Kasiem was recorded as having decreased visual acuity. Sullivan medical staff requested an optometry evaluation for Kasiem; the request was reviewed by Sidorowicz.  On October 8, an optometrist found that Kasiem had "mild cataracts", and that he "won't read letters on chart".  Sullivan medical staff subsequently referred Kasiem for an ophthalmology examination.

On November 3, Kasiem was seen by Dr. Michael Belin ("Belin"), an ophthalmologist at Eastern Correctional Facility. Belin's report noted that Kasiem showed some signs of macular dystrophy, a degenerative eye condition that can lead to decreased vision.  Belin recommended that Kasiem have a formal retinal evaluation.  Belin also stated that Kasiem would "need magnifiers/computer reader to assist reading".  Belin referred Kasiem for a retinal evaluation to Dr. Jerome Schartman ("Schartman"), an ophthalmologist at the Coxsackie Correctional Facility Regional Medical Unit ("Coxsackie RMU").

Schartman examined Kasiem on December 8.  Schartman found that Kasiem showed some indications of macular dystrophy, but Schartman also found no sign of bone spindles.  According to Sidorowicz, a discovery of bone spindles "would signify greater damage to the eye with greater loss of function."  Schartman referred Kasiem for additional low vision evaluation.  In

10

addition, Schartman signed a Request for Reasonable Accommodations form, which indicated that Kasiem had "severe visual impairment".

On January 12, 2009, Kasiem attended a follow-up examination at Coxsackie RMU's Retina Clinic, during which a visual field test was performed.  According to the consultant's report from the January 12 examination, Kasiem "state[d] he could not see anything in the testing procedure."  The consultant stated that the results of the examination showed "poor reliability" and were "uninterpretable".

On July 13, Kasiem had a follow-up appointment with Belin. In his report of the appointment, Belin noted that previous tests performed to establish whether Kasiem suffers from macular dystrophy were "unreliable".  Belin also noted that Kasiem's cataracts were "unlikely visually significant".  With respect to Kasiem's request for low vision accommodations, Belin questioned whether Kasiem was a "malingerer as [patient] easily ambulates and is able to see small objects at near."

On September 15, Dr. Monica Casey-Gee ("Casey-Gee"), an optometrist at the Northeastern Association for the Blind in Albany, performed a Low Vision Evaluation ("LVE") on Kasiem.  An LVE is a functional vision exam where a patient reads charts and devices are used to provide the patient with assistance.  Casey-

Gee measured Kasiem as having visual acuity in both eyes below the minimum threshold for legal blindness.  Specifically, Kasiem was recorded as having visual acuity of 5/400 in his left eye and 5/250 in his right eye.  Casey-Gee recommended that Kasiem be provided with various accommodations, including magnifiers, large print, "voice output" computers and books, and the ability to view closed circuit video magnification televisions.  On October 5, Kasiem's request for accommodations for "severe macular dystrophy" was approved by Sullivan staff, entitling Kasiem to accommodations including large print, magnifiers, tape players and cassettes, a lamp, visor and sunglasses for indoor use, use of the legal computer in Sullivan's law library, and closed circuit television.

On October 15, Kasiem attended a follow-up appointment at Coxsackie RMU, during which a photograph of his eyes was to be taken.  Coxsackie RMU staff were unable to complete the examination, however.  According to staff notes taken in connection with the examination, Kasiem "refused to cooperate or follow direction [sic] to complete testing".

Kasiem's vision accommodations were thereafter revoked on November 3, based upon his failure to cooperate with testing at Coxsackie RMU.  On November 9, in a memorandum to Lisa Chenel, Sullivan's Senior Corrections Counselor, Sullivan's Nurse

12

Administrator wrote that as of November 5, "it is the position of Inmate Kasiem's primary health care provider that there is no reliable verification on file to support legal blindness."  The November 9 memorandum also notes that a "follow up appointment will be made for objective testing at Albany Medical Center. The inmate has been encouraged to cooperate."

On November 9, Kasiem was brought to the Sullivan infirmary on a stretcher.  Kasiem was initially unresponsive to medical staff.[2]  According to contemporaneous and detailed notes taken by medical staff, however, a staff member observed Kasiem lift his head off his pillow, open his eyes, make eye contact with the staff member, and then close his eyes and drop his head back down to the pillow.  Kasiem stayed in the infirmary until November 20.  During this time, Kasiem did not have access to vision assistance devices beyond his eyeglasses.  Patient progress notes kept by Sullivan medical staff during Kasiem's stay in the infirmary reflect instances in which Kasiem followed a staff member's movements with his eyes, asked a staff member to move an object from where the staff member had just placed it, and several instances in which Kasiem moved freely without assistance.  On November 16, Sidorowicz received a letter from

---

[2] According to Kasiem, he slipped on a wet floor, tripped on a mop bucket, and fell down a flight of concrete stairs.

Kasiem, written in small print, describing the slip-and-fall accident that Kasiem asserts occurred on November 9.

On January 5, 2010, Kasiem participated in a visual evoked potential study ("EVP") at Albany Medical Center.  An EVP measures the extent to which the brain responds to visual stimulus.  The EVP was performed by Dr. Anthony Ritaccio ("Ritaccio"), a professor of neurology and neurosurgery at Albany Medical College.  Ritaccio reported "an extremely low amplitude but reasonably reproducible P100 waveform estimated at 124 milliseconds left and 116 milliseconds right."  Ritaccio further stated:  "The study documents impairment of conduction in bilateral anterior visual pathways."  According to Sidorowicz, "maximum value for P100 should be 115 milliseconds in male patients younger than 60 years, which then rises to 125 milliseconds above 60."  At the time, Kasiem was 55 years old. Sidorowicz states that the EVP results suggested to him "decreased visual acuity, but they also confirm that he is not blind[.]"

Kasiem submitted requests for low vision accommodations on February 4 and March 1.  Both were denied by Sullivan medical staff.  On March 4, Sidorowicz wrote in a memorandum to Kasiem:

> You can not be diagnosed as visually or hearing disabled due to your lack of cooperation with testing. The test that you refer to as diagnosing you as being 'Completely Blind' was a subjective test and does not

14

provide justification for your wishes to be
sensorially disabled.
     Close observation of you by all staff . . . is
consistent with malingering.  After reviewing all of
your test results, close observation at infirmary, and
discussion with [medical] staff, there is no evidence
that you are . . . blind[.]
     You . . . are capable of writing long letters
with precision without any visual support.


B.  Neurontin

     Kasiem claims that as a result of the accident that

occurred on November 9, 2009, he began suffering from chronic

lower back pain.  Records from the Sullivan Medical Facility

indicate that Kasiem was initially treated with physical therapy

and the medications Ultram and Tylenol.  Sullivan medical staff

referred Kasiem for an appointment at Coxsackie RMU.  On April

16, 2010, a Coxsackie RMU consultant's report recommended that

Kasiem be given a trial of Neurontin.  Kasiem then requested

that Sullivan medical staff place him on Neurontin.  On April

23, Sullivan medical staff prescribed and provided Kasiem with

600 mg doses of Neurontin to be taken once daily for neuropathic

pain.  Neurontin, also known as Gabapentin, is an antiepileptic

drug that is "commonly used for treating neuropathic pain,

usually defined as pain due to damage to nerves."  Nat'l Ctr.

for Biotechnology Info., Nat'l Inst. of Health, "Gabapentin for

chronic neuropathic pain and fibromyalgia in adults", PubMed

15

Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014677/
(last viewed June 15, 2012).  Kasiem was provided with Neurontin
by Sullivan medical staff between April 22 and July 20, 2010.

On May 24, Kasiem complained of continued lower back pain,
and requested that his prescribed dosage of Neurontin be
increased.  On June 1, Sullivan medical staff increased Kasiem's
Neurontin dosage to 600 mg twice a day.

On June 8, Kasiem began complaining of symptoms including
"double, blurry vision," "severe loss of hearing," and "numbness
of buttocks and thighs."  He requested that Sullivan medical
staff provide him with more pain medication.  At his next
scheduled appointment on June 14, however, Kasiem stated that he
was having "no problem" with blurry vision and hearing loss, and
did not mention the other symptoms he had claimed to be
experiencing.  At an appointment on June 18, Sullivan medical
staff counseled Kasiem on Neurontin's possible side effects;
Kasiem stated that he wished to continue taking the medication.

On July 20, Kasiem submitted a "Refusal of Medical
Examination and/or Treatment" form to the Sullivan Medical
Facility, in which he stated that he was "refusing Neurontin due
to side effects."  Kasiem further stated:  "Due to the severe
side effects of NEURONTIN, patient is suffering from abnormal
thinking, hallucinations, swelling feet, ankles, legs, loss of

16

hearing, blurry-double vision, abnormal coordination, 7/9/10 accident fall in shower sustained severe injury to lower back and head."  Kasiem was taken off Neurontin, and has not taken the medication since July 20, 2010.

Kasiem, however, claims that he continues to suffer "severe side effects" from taking the medication.  Kasiem states that as a result of taking Neurontin he has experienced "severe brain damage, psychological damage, severe visual impairment with double-blurry vision, [and] severe hearing loss in both ears[.]" Kasiem also claims that he continues to suffer "chronic unbearable pain in his lower spine from nerve damage[.]"

PROCEDURAL HISTORY

On November 20, 2009, Kasiem filed this lawsuit against numerous officers and employees of Sullivan and DOCS.  On May 7, 2010, the defendants moved to dismiss Kasiem's November 20 complaint.  That motion was granted in part on January 18, 2011. See 2011 WL 166929 (S.D.N.Y. Jan. 18, 2011).  Kasiem's retaliation claim against Lawrence and due process claim against Hilton survived, however, and the Court also permitted Kasiem leave to amend for the sole purpose of alleging claims against Sidorowicz based upon deliberate indifference to a serious medical condition.  Id. at *11.  Kasiem filed his amended

17

complaint against Lawrence, Hilton, and Sidorowicz on February 9.

On December 26, Kasiem moved for a temporary restraining order and preliminary injunction against Sidorowicz.  Liberally construed, Kasiem's December 26 motion claimed a right to immediate medical intervention to prevent ongoing eyesight deterioration.  The Court denied Kasiem's December 26 motion on February 9, 2012.

On December 12, Kasiem moved for partial summary judgment on his retaliation and due process claims.  The defendants moved for summary judgment on February 21, 2012.  The motions became fully submitted on April 19, when Kasiem submitted a letter in further opposition to the defendants' February 21 motion.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most

favorable to the non-moving party.  Roe v. City of Waterbury,
542 F.3d 31, 35-36 (2d Cir. 2008).  When the moving party has
asserted facts showing that the non-movant's claims cannot be
sustained, the opposing party must "set forth specific facts
showing that there is a genuine issue for trial," and cannot
rest on the "mere allegations or denials" contained in the
pleadings.  Fed. R. Civ. P. 56(e); Wright v. Goord, 554 F.3d
255, 266 (2d Cir. 2009).  That is, the nonmoving party "must do
more than simply show that there is some metaphysical doubt as
to the material facts."  Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over
material facts -- facts that might affect the outcome of the
suit under the governing law -- will properly preclude the entry
of summary judgment.  SCR Joint Venture, 559 F.3d at 137.  "It
is well established that the submissions of a pro se litigant
must be construed liberally and interpreted to raise the
strongest arguments that they suggest."  Triestman v. Fed. Bur.
of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)
(citation omitted).  The rule favoring liberal construction of
pro se submissions is especially applicable to civil rights
claims.  See Weixel v. Bd. of Ed. of the City of New York, 287
F.3d 138, 146 (2d Cir. 2002).

I.  First Amendment Retaliation

Kasiem asserts First Amendment retaliation claims against Lawrence arising out of both the March 9 IMR and the June 16 IMR.  The parties have cross-moved for summary judgment on these claims.  The defendants' motion is granted.

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show . . . (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (citation omitted).  Since it is "near[ly] inevitabl[e]" that "prisoners will take exception" with the decisions of prison officials, the Second Circuit has cautioned that prisoners' retaliation claims must be "examin[ed] . . . with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995); see also Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003).

A.  The March 9 IMR

Kasiem claims that Lawrence retaliated against him by filing the March 9 IMR when he warned her that she was the target of sexual harassment.  The defendants argue that they are

20

entitled for several reasons to judgment as a matter of law on Kasiem's retaliation claim against Lawrence based upon her filing of the March 9 IMR, which charged Kasiem with lying, interference, and harassment.  First, the defendants argue that Kasiem's comments to Lawrence on March 9, 2009, about the contents of a piece of paper and how other officers were discussing her do not constitute protected speech.  The defendants also argue that Kasiem would have been placed in keeplock regardless of any retaliatory motive on Lawrence's part, and that Lawrence is entitled to qualified immunity. Because the comments Kasiem made to Lawrence that prompted the March 9 IMR do not constitute protected speech, it is unnecessary to reach these latter issues.

The essential facts of the encounter between Kasiem and Lawrence are undisputed.  Kasiem falsely described information on a piece of paper, reported offensive and sexually graphic remarks, and conveyed an implicit threat.  This conduct reasonably supported the charges against Kasiem in the March 9 IMR for lying, interference, and harassment.

Kasiem contends that in speaking to Lawrence he was making an "oral sexual harassment complaint" or grievance.  It is true that "[p]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for

the redress of grievances, and prison officials may not
retaliate against prisoners for the exercise of that right."
Colon, 58 F.3d at 872.  But, DOCS provides prisoners with a
system for filing grievances, see Espinal, 558 F.3d at 125-27
(describing DOCS' inmate grievance procedures); indeed,
allegations of employee harassment in DOCS' facilities are
subject to expedited grievance procedures.  See N.Y. Comp. Codes
R. & Regs. tit. 7, § 701.8.

Having chosen not to use the grievance process provided by
DOCS, Kasiem cannot claim that his comments to Lawrence are
entitled to the same protection that adheres to properly filed
grievances.  Moreover, legitimate penological interests  -- to
wit, in rehabilitation and preserving institutional authority --
permit prison officials to discipline inmates who engage in
vulgar and insulting behavior even when inmates are taking part
in otherwise protected activities.  See, e.g., Morgan v.
Quarterman, 570 F.3d 663, 667 (5th Cir. 2009) (prison could
discipline litigating inmate who sent opposing counsel vulgar
note written on toilet paper); Lockett v. Suardini, 526 F.3d
866, 874 (6th Cir. 2008) (inmate's insulting comments to
disciplinary hearing officer not protected speech); Freeman v.
Texas Dep't of Criminal Justice, 369 F.3d 854, 864 (5th Cir.
2004) ("Prison officials may legitimately punish inmates who

verbally confront institutional authority without running afoul of the First Amendment.").

Kasiem cites Pearson v. Welborn, 471 F.3d 732 (7th Cir. 2006), in support of the proposition that an inmate's oral complaint about prison conditions may be entitled to First Amendment protection. Pearson is easily distinguished. In Pearson, the defendant conceded that the oral complaints at issue qualified as "speech that is necessary to inform prison officials of prisoner needs and to protect a prisoner's right to later petition the courts" and would have been entitled to protection if reduced to writing. Pearson, 471 F.3d at 741. In stark contrast to the speech at issue in Pearson, Kasiem's comments were offensive, disruptive, and not reasonably understood to be a complaint about prison conditions.


B.   The June 16 IMR

Kasiem next contends that Lawrence improperly filed the June 16 IMR against him in retaliation for his successful appeal of the adverse finding which followed the March 9 IMR. The defendants seek summary judgment on the grounds that Kasiem's behavior warranted the filing of the June 16 IMR even in the absence of any protected conduct. The defendants are entitled to summary judgment on this claim as well.

23

A plaintiff must show "a causal connection between . . . protected speech and the adverse action" to sustain a First Amendment retaliation claim.  Espinal, 558 F.3d at 128 (citation omitted).  To demonstrate causation, an inmate plaintiff bears the burden of showing that his constitutionally protected conduct "was a substantial or motivating factor for the adverse actions taken by prison officials."  Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003).  If the plaintiff makes such a showing, prison officials may still evade liability if they can demonstrate that the plaintiff would have been disciplined "even in the absence of protected conduct."  Id. (citation omitted).  "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report."  Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (citation omitted).

Kasiem does not dispute that any of the conduct described in the June 16 IMR occurred.  He does not dispute that he failed to obey an order, that he was not entitled to an employee assistant, or that his letter to Lawrence constituted unusual and improper contact with prison staff.[3]  Because it is

_____

[3] While Kasiem takes issue with Lawrence's characterization of the incident as stalking in violation of Prison Disciplinary Rule 101.22, he does not argue that his conduct does not qualify

undisputed that Kasiem committed the prohibited conduct charged

in the June 16 IMR, the defendants are entitled to summary

judgment on this claim.


II.  Hilton:  Due Process Claim

The parties have cross-moved for summary judgment on

Kasiem's due process claim against Hilton.  Hilton presided over

the disciplinary hearing that addressed the June 30, 2009 IMR.

Kasiem asserts that there was insufficient evidence to find him

guilty of the infractions with which he was charged, and that

there were other procedural irregularities in the hearing.  As

before, the relevant facts are essentially undisputed.  The

defendants' motion is granted.

When asserting a due process claim under § 1983 "a

plaintiff must establish (1) that he possessed a liberty

interest and (2) that the defendants deprived him of that

interest as a result of insufficient process."  Ortiz v.

---

as harassment, the other serious charge alleged in the June 16
IMR.  Both stalking and harassment may be charged as Tier I-III
violations.  See N.Y. Dep't of Corr. Servs., Standards of Inmate
Behavior, All Institutions (rev. ed. 2006).  "Prison
Disciplinary Rule 107.11 prohibits inmates from harassing any
person orally or in writing."  Van Bramer v. Selsky, 303 A.D.2d
808, 808 (3d Dep't 2003).  An inmate may violate the prohibition
on harassment through a one-time communication "likely to cause
annoyance or alarm".  Id.  A prisoner may be disciplined under
Rule 107.11 without any showing that the prisoner acted with the
intent to annoy or alarm.  Id.

McBride, 380 F.3d 649, 654 (2d Cir. 2004) (citation omitted).

"To be actionable, the liberty interest must subject the

prisoner to 'atypical and significant hardship . . . in relation

to the ordinary incidents of prison life.'" Vega v. Lantz, 596

F.3d 77, 83 (2d Cir. 2010) (quoting Sandin v. Conner, 515 U.S.

472, 484 (1995)).  While keeplock confinement, more commonly

referred to as confinement in a SHU, without unusual conditions

for a period of up to 101 days will generally not constitute an

atypical hardship,[4] confinement for a period of more than 305

days has been held to be atypical even if under "normal

conditions."  Ortiz, 380 F.3d at 654; Colon v. Howard, 215 F.3d

227, 231 (2d Cir. 2000).  When an inmate is confined for "an

intermediate duration -- between 101 and 305 days -- development

of a detailed record of the conditions of the confinement

relative to ordinary prison conditions is required" in order for

---

[4] Under the "normal conditions of SHU confinement in New York,"
the prisoner is:

> placed in a solitary confinement cell, kept in his
> cell for 23 hours a day, permitted to exercise in the
> prison yard for one hour a day, limited to two showers
> a week, and denied various privileges available to
> general population prisoners, such as the opportunity
> to work and obtain out-of-cell schooling.  Visitors
> [are] permitted, but the frequency and duration [is]
> less than in general population.  The number of books
> allowed in the cell [is] also limited.

Palmer v. Richards, 364 F.3d 60, 65 n.3 (2d Cir. 2004)
(citation omitted).

an inmate to establish an atypical hardship.  Palmer, 364 F.3d at 65 (citation omitted).  "Disputes about conditions may not be resolved on summary judgment, but where the conditions are undisputed, the . . . issue should be resolved by the court as a matter of law."  Palmer, 364 F.3d at 65 (citation omitted).

Assuming an inmate has stated a valid liberty interest, due process requires that he receive certain procedural protections at a disciplinary hearing, including:

> advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).

The Due Process Clause also dictates the "quantum of evidence required to support a prison's decision to discipline an inmate."  Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004).  To "comport with the minimum requirements of procedural due process" a prison disciplinary board's findings must be "supported by some evidence in the record."  Id. at 487-88 (quoting Superintendent v. Hill, 472 U.S. 445, 455 (1985)).  This standard is met if there is "any evidence in the record that supports the disciplinary ruling," so long as this minimal

amount of evidence is "reliable."  <u>Sira</u>, 380 F.3d at 69
(citation omitted).

   Kasiem's sentence of 120 days is at the very low end of the
"intermediate" range, where courts are required to scrutinize
the factual record carefully to determine whether an inmate
suffered an atypical hardship.   In his opposition papers to the
defendants' motion for summary judgment, Kasiem does not take
issue with the defendants' contention that Kasiem did not suffer
an "atypical hardship".   Nonetheless, it will be assumed for
purposes of this Opinion that Kasiem has shown that a sentence
of 120 days in SHU constituted an infringement of a liberty
interest and entitled him to due process at his disciplinary
hearing.

   The hearing over which Hilton presided satisfied all
procedural due process requirements for inmate disciplinary
hearings.   The June 30 IMR provided Kasiem with advance written
notice of the charges against him.   Hilton allowed Kasiem to
call and question witnesses, including Nelson and Johnson, and
to present the competing versions of the Legal Assistance Form
that his employee assistant had procured for him.   Kasiem has
failed to put forth any evidence that Hilton was biased against
him.   In the context of prison disciplinary hearings, "an
impartial decisionmaker is one who, <u>inter alia</u>, does not

prejudge the evidence and who cannot say, with . . . utter
certainty . . ., how he would assess evidence he has not yet
seen." Patterson v. Coughlin, 905 F.2d 564, 570 (2d Cir. 1990).
The hearing transcript makes clear that Hilton did not prejudge
Kasiem.  Hilton repeatedly adjourned the hearing to ensure that
Kasiem's witnesses could testify, and to allow Kasiem's employee
assistant to locate documentary evidence.  Additionally, Hilton
engaged in extended colloquy with Kasiem, and allowed Kasiem to
make a lengthy presentation in his defense.  Most importantly,
Hilton found Kasiem not guilty of the contraband charge,
apparently finding credible Kasiem's defense that prison
officials had improperly logged his sewing kit.  Finally,
Kasiem's hearing was recorded, and the record includes both a
transcript of the hearing and a written statement from Hilton of
the evidence he relied upon and his reasons for the disposition.

     The defendants are likewise correct that Hilton's findings
were supported by "some evidence".  The hearing transcript
demonstrates that Hilton was presented with substantial
evidence, including both witness testimony and documents, from
which he could reasonably conclude that Kasiem had provided
unauthorized legal assistance, committed forgery, and made false
statements.  Hilton was presented with substantial
circumstantial evidence that Kasiem had forged a copy of the

Legal Assistance Form to create one with an incomplete expiration date, that he had done so to perform unauthorized legal work for Johnson after the real Legal Assistance Form expired, and that he made false statements to Albert on June 30 in maintaining that he was authorized to perform legal work on Johnson's behalf.  The evidence presented at the hearing easily met the "some evidence" standard necessary to satisfy due process.

The bulk of Kasiem's arguments in support of his due process claim are geared towards establishing that Hilton's findings were not supported by "some evidence in the record". First, Kasiem argues that evidence that an inmate is in possession of another inmate's legal documents, without more, is insufficient to establish unauthorized legal assistance. See, e.g., McAllister v. Fischer, 51 A.D.3d 1159, 1160 (3d Dep't 2008).  Evidence at the hearing, however, went beyond Kasiem's mere possession of Johnson's legal documents.  Evidence of Kasiem's attempt to convince Albert that he was authorized to perform legal assistance for Johnson supports a reasonable inference that Kasiem was actually providing legal assistance.

Next, Kasiem argues that his due process rights were violated because Hilton failed to produce the "original physical evidence of the legal assistance form" at the disciplinary

hearing.  The argument that Hilton's findings were not supported by "some evidence" because a specific piece of evidence was not presented at the hearing is unavailing.

Kasiem also argues that his due process rights were violated because Hilton "refus[ed] to call [Nelson] to make a personal appearance at the hearing to visually inspect" the copy of the Legal Assistance Form obtained from the law library. Kasiem's argument is meritless; it was Kasiem's own decision not to have Nelson appear a second time to testify.

Kasiem further argues that Hilton's written statement of the evidence upon which he based his findings was inadequate. In the prison disciplinary context, due process requires a "written statement by the factfinder[] as to the evidence relied on and reasons for the disciplinary action." Wolff v. MacDonnell, 418 U.S. 539, 565 (1977) (citation omitted).  The Court has explained the requirement in the following manner:

> Written records of proceedings will . . . protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding.  Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly.  Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others.

31

Id.  Hilton specified in his written statement that he based his findings on Albert's written account in the June 30 IMR as well as the testimony of witnesses at the disciplinary hearing.  As importantly, there is a transcript of the hearing.  While a more detailed discussion of the evidence on which Hilton relied would have been desirable, given the existence of the transcript, due process has been satisfied.

Kasiem also points to the testimony of Johnson as supporting his defense that the original Legal Assistance Form did not bear a complete expiration date.  That certain evidence was arguably exculpatory does not undermine the conclusion that there existed other, more compelling evidence to support Hilton's findings.

Finally, Kasiem cites "pervasive corruption at Sullivan" in arguing that he could not receive a fair trial from Hilton.  Kasiem's conclusory allegations of bias do not allow him to escape summary judgment.


III.  Sidorowicz:  Deliberate Indifference Claim

Kasiem alleges that Sidorowicz acted with deliberate indifference to serious medical needs in (1) refusing to provide Kasiem with reasonable accommodations for severe visual impairment, and (2) prescribing Neurontin to treat Kasiem's

32

neuropathic pain.  The defendants are entitled to summary judgment on Kasiem's deliberate indifference claims.

Although the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care, it is well-established that "not every lapse in medical care is a constitutional wrong." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citation omitted).  "An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of deliberate indifference to a prisoner's serious medical needs." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted).  The standard for deliberate indifference includes both subjective and objective components.  Id.

In order to satisfy the objective component of deliberate indifference, the inmate must demonstrate a deprivation of medical care that is "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Id. (citation omitted).  To determine whether a deprivation of medical care is "sufficiently serious," a court must first ask "whether the prisoner was actually deprived of adequate medical care." Salahuddin, 467 F.3d at 279.  "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." Id. (citing Farmer v. Brennan, 511 U.S. 825, 844-47 (1994)).  An inmate is not

33

entitled to treatment by every available medical alternative as long as his treatment is reasonable.  Estelle v. Gamble, 429 U.S. 97, 107 (1976).  Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

A court must also inquire as to "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Salahuddin, 467 F.3d at 280 (citation omitted).  If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious."  Id.  If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower."  Id.  Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).

The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind."  Salahuddin, 467 F.3d at 280 (citation omitted); see also Caiozzo v. Koreman, 581 F.3d 63, 71 (2d Cir. 2009).  "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." Salahuddin, 467 F.3d at 280 (citation omitted).  "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  Id. (citation omitted).  This means that the prison official "must be subjectively aware that his conduct creates such a risk."  Id. at 281 (citation omitted).  "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness -- an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." Hill, 657 F.3d at 123 (citation omitted).


A.  Visual Impairment

Kasiem claims he suffers from severe visual impairment, to the point of being legally blind, and that Sidorowicz's refusal to provide Kasiem reasonable accommodations constitutes deliberate indifference.  Even assuming Kasiem could demonstrate

a sufficiently serious deprivation of medical care, no reasonable juror could find that Sidorowicz acted with conscious disregard of a substantial risk of serious harm to Kasiem.

As with Kasiem's other claims, the relevant facts are essentially undisputed.  The record is clear that Sidorowicz approved consultations with several eye doctors outside of Sullivan, including doctors outside of DOCS, to determine the extent of Kasiem's decreased visual acuity.  From these consultations, a clear pattern emerged.  Where examination results depended upon Kasiem's own claims of what he could see or not see, results indicated that Kasiem was blind or near-blind.  When doctors attempted to test Kasiem's vision in an objective manner, without reference to what Kasiem himself claimed he could see, Kasiem either refused to cooperate or the results were inconsistent with Kasiem's own claims and the results of the more subjective tests.  Most prominently, after accommodations for blindness were provided following the LVE, Kasiem refused to cooperate with attempts by Coxsackie RMU staff to photograph his eyes.  Soon thereafter, the EVP performed by Ritaccio at the Albany Medical Center indicated that while Kasiem did have decreased visual acuity, his visual impairment was not severe and accommodations for blindness were not necessary.  Kasiem does not allege that he was deprived

accommodations for moderate visual impairment, such as corrective lenses.

Just as significantly, Kasiem's medical records contain numerous observations of Kasiem behaving in a manner inconsistent with an individual suffering from severe visual impairment. Dr. Belin at the Eastern Correctional Facility, for example, observed that Kasiem "easily ambulates and is able to see small objects at near." During Kasiem's stay at the Sullivan infirmary in November 2009, Sullivan medical staff observed Kasiem following nurses' movements with his eyes and requesting that objects be placed in different positions in his room. As Belin noted, strong evidence suggested that Kasiem was a "malingerer" and greatly exaggerating any vision problems he had.

Kasiem has failed to offer any evidence suggesting that Sidorowicz consciously disregarded a substantial risk that serious harm could befall Kasiem through the deprivation of accommodations for severe visual impairment. To the contrary, Sidorowicz's March 4, 2010 memorandum to Kasiem explains the basis for the decision not to provide accommodations, resting upon a comprehensive medical record and observations by staff consistent with Belin's concern that Kasiem was "malingering".

There would be no basis for a reasonable juror to find that Sidorowicz had a culpable state of mind.

Kasiem principally seeks to rely upon the results of the LVE performed by Casey-Gee on September 15, 2009, which suggested, based upon Kasiem's own representations of what he could see or not see, that Kasiem was legally blind.  Sullivan medical staff, however, attempted to verify these results through testing that did not rely upon Kasiem's own statements. It was not unreasonable to seek verification, given the manifold indications in Kasiem's medical records of Kasiem acting as one who could see while claiming that he could not.  Likewise, it was not unreasonable for Sidorowicz and other Sullivan medical staff to be skeptical of the LVE results after (1) Kasiem refused to cooperate with attempts to photograph his eyes, and (2) the EVF performed by Ritaccio was inconsistent with Casey-Gee's LVE.

Kasiem also accuses Sidorowicz of refusing to provide accommodations "based on a non-medical factor of retaliation for filing grievances."  Beyond this conclusory allegation, Kasiem has offered no evidence of which grievances he is referring to, or of any link between grievances and Sidorowicz's treatment decisions.

B.  Neurontin

Kasiem also claims that Sidorowicz was deliberately
indifferent to his serious medical needs when Kasiem was
prescribed Neurontin to treat neuropathic pain.  Kasiem
essentially argues medical malpractice: that Sidorowicz "knew or
should have known" that Neurontin is an epilepsy medication and
not effective for treating neuropathic pain; and that Sidorowicz
"knew or should have known of the severe side effects of
Neurontin."

Kasiem's claim fails.  "[A] complaint that a physician has
been negligent in diagnosing or treating a medical condition
does not state a valid claim of medical mistreatment under the
Eighth Amendment."  Hill, 657 F.3d at 123.  Kasiem has put
forward no evidence that Sidorowicz knew that Neurontin is
ineffective in treating neuropathic pain.  In fact,
"[a]ntiepileptic drugs like [Neurontin] are commonly used for
treating neuropathic pain."  Nat'l Ctr. for Biotechnology Info.,
Nat'l Inst. of Health, "Gabapentin for chronic neuropathic pain
and fibromyalgia in adults", PubMed Health,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014677/ (last
viewed June 15, 2012).  The use of Neurontin to treat many types
of neuropathic pain "is associated with a moderate benefit
(equivalent to at least 30% pain relief) in almost one in two

39

patients (43%), and a substantial benefit (equivalent to at least 50% pain relief) in almost one in three (31%)."  Id.

Kasiem argues that the FDA has not approved Neurontin for use in treating neuropathic pain, and that Neurontin's manufacturer was found in 2010 to have violated laws against so-called "off-label marketing" by aggressively marketing the drug to physicians for use in treating neuropathic pain.  See In re Neurontin Marketing and Sales Practices Litigation, 748 F.Supp.2d 34, 37-38 (D.Mass. 2010).  As the court in the Neurontin off-label marketing litigation noted, however, "it is legal for physicians to prescribe drugs off-label[.]"  Id. at 83.

Kasiem also argues that he continues to suffer "severe side effects" from taking Neurontin for three months in 2010, including "severe brain damage, psychological damage, severe visual impairment with double-blurry vision, [and] severe hearing loss in both ears[.]"  Kasiem has failed to produce any evidence that he actually suffers from these conditions, let alone that these conditions were caused by the Neurontin prescribed by Sidorowicz.

Kasiem has failed to raise a material factual dispute as to whether Sidorowicz was deliberately indifferent in prescribing

Neurontin to treat Kasiem's neuropathic pain.  The defendants

are entitled to summary judgment on Kasiem's final claim.


Conclusion

The defendants' February 21 motion for summary judgment is

granted.  Kasiem's December 12 motion for partial summary

judgment is denied.  The Clerk of Court shall enter judgment for

the defendants and close this case.

SO ORDERED:

Dated:    New York, New York
          July 17, 2012

                                    _____
                                           DENISE COTE
                                    United States District Judge

41

Copies Sent to:


Allah-Kasiem                          Kevin R. Harkins
83-A-0783                             New York Attorney General's Office
Sullivan Correctional Facility        120 Broadway, 24th Floor
P.O. Box 116                          New York, NY 10271-0332
Fallsburg, NY 12733